IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


EILEEN MCAFEE,

     Plaintiff,

v.                           Civil Action No. 3:11cv646

CHRISTINE M. BOCZAR,

     Defendant.


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's PETITION FOR ATTORNEY'S FEES AND COSTS (Docket No. 113). For the reasons set forth below, the motion will be granted in part and denied in part.

## PROCEDURAL AND FACTUAL BACKGROUND

On December 26, 2010, Eileen McAfee, a resident of Henrico County, received a request from a friend in Powhatan County to assess the circumstances of a dog which the friend thought was in distress. The two later visited the dog's owner who gave permission for them to examine the dog. McAfee concluded that the dog was in satisfactory condition, but that it needed a new dog house. Having secured permission of the owner, McAfee bought a dog house and delivered it to the owner and then helped to set it in place. In the process, McAfee fed the dog a treat, and, in

its exuberance to eat the treat, the dog accidentally bit McAfee.

McAfee was treated at a local hospital which reported the bite to Powhatan County where the report was given to Ms. Christine Boczar, a deputy sheriff, employed by Powhatan County, Virginia. The record at trial showed that after receiving the report Boczar telephoned McAfee, and asked whether McAfee knew the address where the dog was housed. McAfee replied that she did not know the address but thought she could show the location to Boczar and offered to do so. Boczar evinced no interest and the conversation ended because Boczar claimed to be busy when McAfee inquired about whether the dog might be euthanized to test for rabies. That was the only conversation that Boczar ever had with McAfee.

At trial Boczar claimed that, before having the arrest warrant issued, she had received information from Sharon Wampler, who had spoken with McAfee, which confirmed that McAfee was withholding the address where the dog was housed because of a concern that the dog would be euthanized to test for rabies. However, when Wampler testified, she testified only that she told Boczar that McAfee had expressed concern about the dog, not that McAfee knew the dog's location or was withholding it.

Thus, without any real basis in fact, Boczar concluded that McAfee was withholding the location of the dog and, acting

2

without probable cause, Boczar had McAfee arrested for violating a Virginia statute which made illegal withholding of information about possibly rabid animals. McAfee was acquitted on the merits when, at the conclusion of the prosecution's case, the court dismissed the charge.

On September 28, 2011, McAfee commenced this action by filing a Complaint against Boczar, alleging malicious prosecution and a violation of the Fourth Amendment (Count I); malicious prosecution under state law (Count II); and a false imprisonment state law claim (Count III). (Docket No. 1). After Boczar filed an Answer and an Amended Answer, she moved for partial summary judgment on the basis of the doctrine of qualified immunity. (Docket No. 26). The parties briefed the motion, and the Magistrate Judge issued a REPORT AND RECOMMENDATION (Docket No. 53) recommending that the motion be denied. The Court fully adopted the Report, denying the summary judgment motion.

The parties exchanged written discovery, but most of the discovery was in the form of depositions. There were thirteen discovery depositions, seven of so-called "major" witnesses, and six of so-called "minor" witnesses. A fourteenth deposition was taken to preserve for use at trial the testimony of a witness who would not be available at trial.

3

A three-day jury trial commenced on July 2, 2012. Before jury selection, Boczar moved to dismiss Count III of the Complaint pursuant to Fed. R. Civ. P. 50, and the Court granted the motion. (Docket No. 99). Thus, the jury considered only Counts I and II of the Complaint. At trial, McAfee called two witnesses in her case-in-chief and introduced several documents. Boczar called eight witnesses in the defense case and introduced a number of documents. McAfee called two witnesses in her rebuttal case. On July 6, 2012, the jury returned a verdict in favor of McAfee on Count I, the federal malicious prosecution claim, and against McAfee on Count II, the state malicious prosecution claim (Docket No. 103).

In her Complaint, McAfee did not articulate a specific damage request, instead praying for actual damages and punitive damages, in amounts to be determined by the evidence. Complaint p. 11 ¶¶ (b) and (c). At trial, McAfee's counsel proved actual damages of $2,943.00, and, in closing argument, asked the jury to impose such damages as it thought appropriate. The jury awarded actual damages in the amount proved, $2,943.00.

Following the jury verdict, McAfee filed her PETITION FOR ATTORNEY'S FEES AND COSTS (Docket No. 114). Boczar filed her BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEY'S FEES (Docket No. 118). Briefing was suspended while parties met with Magistrate Judge Novak to discuss settlement. The settlement

4

conference was held on September 19, 2012 and was unsuccessful. See REPORT REGARDING SETTLEMENT CONFERENCE (Docket No. 124). The Magistrate Judge reported that the Division of Risk Management ("DRM"), which is responsible to pay the damages award against Boczar, did not negotiate in good faith. On September 21, 2012, the Court entered an Order directing McAfee's reply to specifically address a number of discrete issues (Docket No. 125). McAfee filed her reply on October 5, 2012 (Docket No. 128). Thus, the parties have fully briefed the motion, and it is now ripe for review.

## LEGAL STANDARD

The Civil Rights Attorney's Fees Awards Act of 1976 provides that, in federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. The Supreme Court has directed that a successful plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). The purpose of the fee award statute "is to ensure 'effective access to the judicial process' for persons with civil rights grievances." Hensley, 461 U.S. at 429 (quoting H.R.Rep. No.94-1558 at 1 (1976)). The amount of the award should be "adequate

to attract competent counsel, but not produce windfalls to attorneys." City of Riverside v. Rivera, 477 U.S. 561, 580 (1986) (internal quotations and citations omitted). In order to qualify as a "prevailing party," "the plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought." Farrar v. Hobby, 506 U.S. 103, 111 (1992).

Here, neither party disputes that McAfee is a prevailing party and therefore is entitled to some award of attorney's fees. The disagreement is over the amount that would be "reasonable" under the circumstances of this case. Thus, the Court must now determine whether McAfee has satisfied her burden of establishing that her requested amount of attorney's fees is reasonable. Hensley, 461 U.S. at 437 (explaining that the fee-applicant has the burden of demonstrating the reasonableness of the fee).

The "initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888 (1984); see also Perdue v. Kenny A., __U.S.__, 130 S. Ct. 1662, 1672 (2010) (noting that this approach, the "lodestar approach," has "achieved dominance in the federal courts") (citations and quotations omitted). Hours that were not "reasonably expended" must necessarily be excluded. Hensley, 461 U.S. at 434. "Counsel

. . . should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." Id. And, time devoted to any claims on which the applicant did not prevail must be excluded from the calculation.

There is a "strong presumption that the lodestar figure . . . represents a reasonable fee." Pennsylvania v. Delaware Valley Citizen's Council for Clean Air, 478 U.S. 546, 565 (1986). Indeed, in Perdue, the Supreme Court made clear that the strong presumption for the reasonableness of a lodestar fee figure can only rarely be overcome, 130 S. Ct. at 1673, and then only in "extraordinary cases" which will be presented in the "rarest of circumstances." Id. at 1677 (Kennedy, J., concurring); see also id. at 1678 (Thomas, J., concurring).

The Court's preference for the lodestar figure as a reasonable fee was explained in perspective of two alternatives: (1) the twelve factor test devised by the Fifth Circuit in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974); and (2) the lodestar method pioneered by the Third Circuit in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973); appeal after remand 540 F.2d 102 (3d Cir. 1976). As to the Johnson twelve factor test, the Supreme Court concluded that:

> This method, however, gave very little actual guidance to district courts. Setting attorney's fees by reference to sometimes

7

> subjective factors placed unlimited
> discretion in trial judges and produced
> disparate results.

Perdue, 130 S. Ct. at 1672 (internal quotation and citation omitted). To explain its preference for the lodestar method of determining a reasonable fee, the Supreme Court said:

> Although the lodestar method is not perfect,
> it has several important virtues. First, in
> accordance with our understanding of the aim
> of fee-shifting statutes, the lodestar looks
> to the prevailing market rates in the
> relevant community. Developed after the
> practice of hourly billing had become
> widespread, the lodestar method produces an
> award roughly approximates the fee that the
> prevailing attorney would have received if
> he or she had been representing a paying
> client who was billed by the hour in a
> comparable case. Second, the lodestar method
> is readily administrable, and unlike the
> Johnson approach, the lodestar calculation
> is 'objective,' and thus cabins the
> discretion of trial judges, permits
> meaningful judicial review, and produces
> reasonably predictable results.

Id. (internal quotations and citations omitted, emphasis in original).

Decisions in our circuit respecting the setting of attorney's fees have been based on the lodestar method, as prescribed by Hensley with substantial reliance on the Johnson twelve factor test, sometimes to inform the calculation of the lodestar, sometimes to make upward or downward adjustments to it, and sometimes for both purposes. That process began with

<u>Barber v Kimbrell's, Inc.</u>, 577 F.2d 216, 226 n.28 (4th Cir. 1978) and has continued since then.[1]

As articulated in <u>Johnson</u>, those factors are:

   (1) The time and labor required;

   (2) The novelty and difficulty of the questions;

   (3) The skill requisite to perform the legal service properly;

   (4) The preclusion of other employment by the attorney due to acceptance of the case;

   (5) The customary fee;

   (6) Whether the fee is fixed or contingent;

   (7) Time limitations imposed by the client or the circumstances;

   (8) The amount involved and the results obtained;

   (9) The experience, reputation, and ability of the attorneys;

   (10) The "undesirability" of the case;

   (11) The nature and length of the professional relationship with the client;

   (12) Awards in similar cases.

---

[1] <u>See</u>, <u>e.g.</u>, <u>Newport News Shipbuilding and Dry Dock, Co. v. Holiday</u>, 591 F.3d 519, 527-28 (4th Cir. 2009); <u>Rum Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 174-75 (4th Cir. 1994).

Johnson, 488 F.2d at 717-19. In Hensley, the Supreme Court approved use of the "factors identified in [Johnson]." Hensley v. Eckerhart, 461 U.S. 434 n.9.

When, in Barber, the Fourth Circuit approved the use of the Johnson factors in our circuit, the Court of Appeals altered the description of some of the factors. As phrased by the Fourth Circuit, the factors are:

> (1) The time and labor expended;
>
> (2) The novelty and difficulty of the questions raised;
>
> (3) The skill required to properly perform the legal services rendered;
>
> (4) The attorney's opportunity costs in pressing the instant litigation;
>
> (5) The customary fee for like work;
>
> (6) The attorney's expectations at the outset of the litigation;
>
> (7) The time limitations imposed by the client or circumstances;
>
> (8) The amount in controversy and the results obtained;
>
> (9) The experience, reputation and ability of the attorney;
>
> (10) The undesirability of the case within the legal community in which the suit arose;
>
> (11) The nature and length of the professional relationship between attorney and client; and

(12) Attorneys' fees awards in similar cases.

Barber, 577 F.2d at 226 n.28.

The changes, however, did not alter the substance of the factors as described by Johnson, but the articulation of Factor 6 is quite different in appearance. In Johnson, Factor 6 is "Whether the fee is fixed or contingent." 488 F.2d at 718. In Barber, Factor 6 is "the attorney's expectations at the outset of the litigation." 577 F.2d at 226 n.28. The Court of Appeals appears not to have regarded that significant difference in phraseology as substantive in effect. Neither does this Court. In future reference to the factors herein, the Court will employ the Fourth Circuit's phraseology from Barber when referring to Factor 6 as well as to any other factor.

Since the Supreme Court decided Perdue, there have been two decisions from our Court of Appeals reviewing district court fee-setting decisions: Abrams & Abrams, P.A. v. National Union Fire Ins. Co., 605 F.3d 238 (4th Cir. 2010) and Jackson v. Estelle's Place, LLC, 391 F. App'x. 239 (4th Cir. 2010). Abrams was decided one month after Perdue, but it does not mention Perdue. Jackson, an unpublished decision, involved the review of a district court's decision to reduce a lodestar figure fee. The majority opinion in Jackson mentioned Perdue, but paid it scant attention and approved the district court's use of the Johnson

11

factors in effecting a reduction of a lodestar fee. 391 F. App'x at 244. The dissent in Jackson relied on Perdue to condemn the fee reduction approved by the majority as representing precisely the subjectivity that prompted the Supreme Court in Perdue to give such strong force to the lodestar method and to criticize the Johnson method. Id. at 249-50 (Gregory, J., dissenting).

The dissent in Jackson did not appear to advocate the view that the Johnson approach had been relegated to the sidelines in fee analysis. However, that appears to be the necessary consequence of Perdue because it so strongly underscores the presumptive validity of a properly calculated lodestar fee as reasonable and teaches so clearly that departures from the lodestar figure are to occur rarely and only in extraordinary cases.

Moreover, Perdue once again emphasized that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable attorney's fee,'" and reminded that "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." Perdue, 130 S. Ct. at 1673 (internal citation omitted). In making the latter point, the Court actually foreclosed use of a Johnson factor (Factor 2 – the novelty and difficulty of the questions) as an enhancement because it was reflected in the time component of the lodestar calculation. Id. ("We have thus held that the novelty and

12

complexity of a case generally may not be used as a ground for an enhancement because these factors presumably are fully reflected in the number of billable hours recorded by counsel.") (internal quotations and citation omitted). Similarly, the Court held that there could be no enhancement of the lodestar figure for the attorney's performance, finding that the quality of representation (very much like Johnson Factor 3 - skill of the attorney) normally is reflected in a reasonable hourly rate.[2] Id. at 1674 n.5 (noting that an attorney's "special skill and experience should be reflected in the reasonableness of the hourly rate) (quoting Blum, 465 U.S. at 898).

What then is left of Johnson after Perdue? That question is best answered by assessing the individual Johnson factors to determine if they are subsumed in the lodestar calculus.

The reasonableness of the rate implicates, it seems, Factor 3 (the skill required to properly perform the legal services rendered); Factor 5 (the customary fee); Factor 6 (the attorney's expectation at the outset of the litigation, i.e., whether the fee is fixed or contingent); Factor 9 (the experience, reputation and ability of the attorney); and Factor 4 (the attorney's opportunity cost in pressing the instant

---

[2] The record here confirms that Troutman Sanders' rates are set in part with reference to the attorney's skill, and taken into account what fee that skill has been able to command in the market. Seabolt Aff. at ¶ 2.

litigation). In one way or another, those factors play a role in determination of a reasonable hourly rate, just as they do in a law firm's rating setting process. See, e.g., Ward Bower, Pricing Legal Services, Altman Weil, Inc. Report to Legal Management (March 2004), available via http://www.altmanweil.com (discussing attorney's "specialty," "experience," "firm size," "name recognition," and the rise of "alternative pricing" as key factors influencing "market pricing" for legal services).

The assessment of the number of hours reasonably expended implicates Factor 1 (the time and labor expended); Factor 2 (the novelty and difficulty of the questions raised); and Factor 7 (the time limitations imposed by the client or the circumstances). Each of those factors rather obviously bears on the time that reasonably should be devoted to a case.

That leaves four Johnson factors: Factor 8 (the amount in controversy and the results obtained); Factor 10 (the undesirability of the case within the legal community within which the case arose); Factor 11 (the nature and length of the professional relationship between the attorney and the client); and Factor 12 (attorneys' fees awards in similar cases). Whether these remaining Johnson factors are relevant, and, if so, how, will be assessed later.

Neither McAfee nor Boczar pay heed to Perdue. Instead, both discuss the fee issues with reference to the lodestar

14

calculation and how it is confirmed (McAfee) or should be reduced (Boczar) by making reference to some of the Johnson factors. Because there are significant disputes respecting both lodestar components (the reasonableness of the rate and the number of hours reasonably expended), the disputes over those issues will be first assessed. Then, the other points of difference will be considered.

## DISCUSSION

McAfee seeks an award of attorney's fees in the amount of $365,027 and costs in the amount of $10,305.51. Pl. Pet. for Att'y's Fees and Costs (Docket No. 113). Boczar counters that the fee request is unreasonable and proposes an award of $15,000. Def. Opp. at 24. Boczar has not challenged the requested costs.

## A. Reasonable Rate

"[D]etermination of the hourly rate will generally be the critical inquiry in setting the 'reasonable fee,' and the burden rests with the fee applicant to establish the reasonableness of a requested rate." Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990). The appropriate hourly rate is generally to be determined by applying the "prevailing market rates in the relevant community for the type of work for which [the party] seeks an award." Spell v. McDaniel, 824 F.2d 1380, 1402 (4th Cir. 1987);

15

see also Rum Creek Coal Sales v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994) ("The relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits."); Nat'l Wildlife Federation v. Hanson, 859 F.2d 313, 317 (4th Cir. 1988) ("The community in which the court sits is the appropriate starting point for selecting the proper rate."). "The prevailing market rate may be established through affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market." Spell, 824 F.2d at 1402.

McAfee asks for a rate that is based on, but reduced from, the standard billing rate for the Troutman Sanders attorneys and staff that were involved in the case. Hurd Decl. ¶ 3. These rates are established in the fall of every year and are determined from a variety of factors that include the experience of the timekeeper, data regarding rates for practice areas and geographic markets, and anecdotal information regarding customary practice of similarly-sized firms. Seabolt Decl. ¶ 2. In support of the view that these hourly rates reflect the market rates in the community, McAfee provides the declarations of the lead counsel in this action, William Hurd; the Chief

16

Operating Office of counsel's law firm, Troutman Sanders; and the affidavit of Craig T. Merritt, a preeminent local trial lawyer and member of the American College of Trial Lawyers.[3] After reviewing the case and surveying the local legal market, Merritt determined that, based on his research and experience, the rates charged by McAfee's counsel are "in line with rate for attorneys of comparable experience and reputation" at other major Richmond law firms for similar work in litigation conducted in this district. Merritt Aff. ¶¶ 9, 11.

There is no question that McAfee's counsel enjoy sterling reputations and possess extraordinary resumes.[4] However, while McAfee's affidavits support the claim that Messrs. Hurd's and

---

[3] McAfee also references the Adjusted Laffey Matrix, which provides customary hourly rates for attorneys in Washington, D.C. Hurd Decl. ¶ 5. The Laffey Matrix is largely irrelevant to this action because the relevant market is Richmond, Virginia. See Rum Creek, 31 F.3d at 175; see also Grissom v. The Mills Corp., 549 F.3d 313, 323 (4th Cir. 2008) (noting that the market rate is that of "attorneys in the Eastern District of Virginia of similar skill and for similar work."); Yamaha Motor Corp. v. Jim's Motorcycle, 381 F. Supp. 2d 499, 505 (E.D. Va. 2005) ("The appropriate hourly rate to be used . . . is the rate for similar services by similarly qualified lawyers in the Richmond, Virginia market."). Rates in Washington, D.C. are considerably higher than those in Richmond for equally qualified and experienced attorneys.

[4] McAfee's lead counsel, William Hurd, has a long and distinguished career, including service as the Solicitor General of Virginia. Hurd Decl. ¶ 1. Hurd's firm profile identifies him as an expert in appellate law, election law, and education law. Ex. B to Hurd Decl. The senior associate on the case, Stephen Piepgrass, similarly specializes in appellate matters and complex civil litigation. Hurd Decl. Ex. B.

Piepgrass's rates are "in line with market rates charged private clients for complex civil litigation in the [Richmond] community, the affidavits do not provide specific information about market rates in [Richmond] for comparable civil rights cases." Buffington v. Baltimore County, 913 F.2d 113, 129 (4th Cir. 1990). In McAfee's reply brief, it is established that Mr. Hurd's practice includes much § 1983 litigation and that his standard rates are charged and paid in such cases. Pl. Reply Ex. B. And, as discussed below, Boczar's own expert provides evidence that the rates sought here are within the range for civil rights litigation in the area.

The customary rate is to be determined by looking at what an attorney earns "for similar services in similar circumstances." Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 175 (4th Cir. 1994). McAfee argues that the rate should not be reduced simply "because civil rights cases are somehow simpler." Pl. Reply at 3. This is undoubtedly true, but it is also true that the rate should not be increased just because McAfee's counsel regularly earn higher fees for cases that are more complex. The goal is for the Court to determine what the prevailing rate is, in the relevant community, for similar work. After all, in the context of a statute that specifically referenced an award of "rates prevailing in the community," this Court observed:

18

> [S]uppose that a plaintiff retains a lawyer
> to try a case and the lawyer is the
> preeminent trial lawyer in town and he
> charges and is paid $600 per hour for the
> trial work in the IDEA case. Could that
> lawyer be awarded a fee using that hourly
> rate when the record showed that the
> prevailing rate in the community was $350
> per hour? Certainly not. What if, on the
> other hand, that case had been handled *pro
> bono* by a lawyer who was independently
> wealthy and routinely charged clients $100
> per hour to cover overhead? Would her fee
> under IDEA be limited to $100 per hour? Not
> if the Congressional text is to be given
> effect.

JP ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., 641 F. Supp. 2d 499, 516 (E.D. Va. 2009). This appears to also be the lesson of Blum; that the reasonable rate must be assessed distinctly from the typical rates of the counsel involved, regardless of whether those rates are higher or lower than the market rates. See Blum, 465 U.S. at 895 (fees "under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel."). However, when undertaking that task, it is appropriate to consider the rate which the prevailing party's counsel usually commands and is paid in the relevant market. See id. at 896 n.11 (noting that "the rates charged in private representations may afford relevant comparisons").

The *Buffington* court recognized that "the primary justification for awarding high-end hourly rates for experienced counsel in § 1983 litigation is that their very experience and skill will result in economies of time because of their lack of need for extensive background legal research." 913 F.2d at 130 (citing *Blum*, 465 U.S. at 898). The court noted that, "where . . . counsel is indeed experienced in general but not in the special field of civil rights litigation, [the] justification [for high hourly rates] may upon careful analysis be found lacking." *Buffington*, 913 F.2d at 130.

Boczar argues that McAfee's counsel, although quite clearly talented and experienced attorneys in the general field of federal litigation, lack specific experience in litigating § 1983. Def. Opp. at 14. Boczar suggests that neither Mr. Hurd nor Mr. Piepgrass have "experience in skills relevant to this engagement." *Id.* While McAfee's initial filing may have been lacking in that regard, the information supplied along with her reply brief certainly has disabused the Court of any such concerns.

McAfee's lead counsel has substantial experience as both plaintiff's and defense counsel in § 1983 actions, including cases in which deprivation of liberty in violation of the Fourth Amendment was the predicate of the claim. *See* Hurd Supp. Decl. at ¶ 4. While the details of individual actions need not be

20

repeated, Mr. Hurd has demonstrated extensive experience as lead counsel in actions that have implicated many of the same issues that arose in the present action. See id. at ¶ 4. Accordingly, it appears that McAfee's lead counsel was highly experienced in relevant litigation.[5]   And, the record shows clearly that Mr. Piepgrass, the associate who worked closely with Mr. Hurd, has experience in § 1983 litigation.

Of course, the record must contain supporting evidence in addition to the affidavits of the fee applicant's counsel. Mr. Merritt's affidavit shows that he was thoroughly familiar with the record and was well aware of the nature of the case. And, his affidavit goes on to state that: "[t]he rates listed for the Troutman Sanders attorneys appear to be within the range of hourly rates being charged by comparable firms for similar work." Merritt Aff. ¶ 11.

Boczar submitted the affidavit of Michael Gladstone, an experienced Richmond trial lawyer. Gladstone Aff. Mr. Gladstone

---

[5] This issue might properly fall within the question of the "reasonable hours" since the basis of the court's concern in Buffington was, in significant part, the fear that inexperienced counsel might be less efficient than counsel experienced in § 1983 litigation.   See Buffington, 913 F.2d at 130 (observing "that an inordinate amount of legal research effort was necessitated by these undoubtedly fine lawyers' lack of specific experience in this field").   The discussion is, nonetheless, included here because the Buffington court framed the issue as one of "reasonable rates" and Boczar challenged it as the same. Def. Opp. at 7-8.   Further, Perdue indicates that that the experience of counsel is subsumed in the calculation of the reasonable rate.  130 S. Ct. at 1674 n.5.

surveyed the rates charged in, and the staffing requirements for, tort and § 1983 actions of the type at issue here. Id. at 2. He identified four cases filed pursuant to § 1983 in the Richmond Division, from 2001 to 2012, in which fees were awarded. Id. at 4. The rate for lead counsel in these cases ranged from $200 an hour to $575 an hour. Id.[6] Mr. Gladstone thereupon offered the opinion that a reasonable hourly rate for a lead attorney in an action of this sort in this community was $350 to $410, with the rates of other attorneys and support staff being correspondingly lower. Id. at 5.

Mr. Gladstone also suggested that McAfee is entitled to a lower rate than asked, as well as a lower rate than the high end of the rates actually awarded, in significant part based on his belief that the cases in which higher rates were awarded were "generally of much greater complexity than the case in issue." Id. at 3. That aspect of Mr. Gladstone's opinion is of little utility, however, because, as Perdue makes clear, the novelty and complexity of the case is not a facet of rate determination.

---

[6] Although Mr. Gladstone's figures are said to include rates for plaintiff's firms and for defense firms, he does not differentiate between them. The Court's experience teaches that the rates paid for defending civil rights cases are paid mostly by Virginia's Division of Risk Management and, to some extent by insurers, both of which pay quite low rates in return for giving firms some volume of business. Thus, including defense firm rates tends artificially to lower the range of rates and the average rates.

Rather, it is included in the determination of the number of hours reasonably expended. 130 S. Ct. at 1673.

In her reply, McAfee contends that only one of the cases in Mr. Gladstone's analysis properly reflects the prevailing market rate, viz. that the other cases are too old to be informative. Pl. Reply at 11. In the event that the Court chooses to adopt the Gladstone scale, McAfee argues, the most useful rates are those that are the most recent, which happen to also be the highest and are not substantially different from the rates requested here. Id.

The fundamental difficulty presented by Boczar's opposition is that she seeks to define the relevant market too narrowly: as "the litigation of a tort case with low special damages and no experts." Def. Opp. at 11. This is a cramped interpretation of the concept of "similar services." It may well be true that "what has been will be again, what has been done will be done again;"[7] however it would be far too demanding to require the fee applicant to produce evidence of fee awards in substantially identical cases or to restrict the relevant market to cases that present the same facts or questions of law. Boczar has cited no authority which takes such a narrow view of similar services. Nor could the Court locate such authority.

---

[7] Ecclesiastes 1:9.

23

Moreover, Boczar's narrow interpretation is at odds with the purpose of Congress in enacting § 1988 which was to "encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." <u>Kerr v. Quinn</u>, 692 F.2d 875, 877 (2nd Cir. 1982). As the Supreme Court put it, the purpose of § 1988 fee awards is to prevent situations in which an inadequate fee "would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries." <u>City of Riverside v. Rivera</u>, 477 U.S. 561, 577 (1986) (plurality opinion). Indeed, the Senate Report for the fee-shifting statute makes clear that "the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases." <u>Id.</u> at 575.

It appears to the Court that the concerns raised by Boczar, and by the Fourth Circuit in <u>Buffington</u>, do not apply here. McAfee's counsel are quite clearly experienced in the field of § 1983 litigation and to reduce their rate simply because they are too experienced would be contrary to the very purpose of § 1988.

Further, even if the Court were to adopt the Gladstone scale, the evidence supports the conclusion that the rates

24

requested by McAfee's counsel are reasonable.  Only one of the comparable cases used in the Gladstone scale appears to reflect the current market rates for civil rights litigation in the Richmond Division: Lux v. Judd, 2012 U.S. Dist. LEXIS 83009 (E.D. Va. 2012). In that case, the lead counsel was awarded an hourly rate of $575 and the other attorneys received between $450 and $300 an hour. Here, McAfee is asking for rates that are very similar to those in Lux. McAfee's lead counsel (Mr. Hurd) is asking for $585 (a $10 per hour increase) and the senior associate, Mr. Piepgrass, is asking for $365 an hour ($5 per hour more than the senior associate in Lux). The rates for the junior associates (Mr. St. George and Ms. Flynn) are at or below the rates for the junior members of the team in Lux.

Taking the record as a whole, McAfee has more than met her burden of establishing the reasonable hourly rate for her counsel. Based on the evidence presented, the Court is satisfied that the hourly rates requested by counsel in this case appropriately reflect each attorney's relative seniority and expertise in the field of civil rights litigation. Therefore, the Court finds that the hourly rates requested are reasonable.

**B.   Reasonable Hours**

McAfee is asking for attorney's fees to cover 996.7 hours of work, which is identified as a six percent reduction from the number of hours actually expended. Pl. Mem. at 6.   To support

this request, McAfee has submitted a chart which identifies the timekeeper, the date on which the work was performed, a brief description of the work performed, and the amount of time. Hurd Decl. Ex. A. Also, as directed by the Court, that showing has been augmented by a chart which permits assessment of the total number of hours devoted to specific undertakings. Pl. Reply Ex. A. Boczar makes several objections to the number of hours claimed by McAfee in this litigation.

First, Boczar suggests that the number of hours used to calculate the lodestar figure is inflated because it includes work related to claims on which McAfee was not successful. The parties agree that the prevailing party cannot recover fees for work on an unsuccessful claim. See Pl. Mem. at 6; Def. Br. in Opp. at 5; see also Hensley, 461 U.S. at 434. However, the Supreme Court has recognized that many cases "will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." Id. at 435. Here, McAfee's was unsuccessful on two of her three claims;[8] however, the claims generally arose out of a common set of facts. Nonetheless, as she acknowledges, McAfee cannot recover fees for the work done

---

[8] Count III was dismissed prior to trial pursuant to Fed. R. Civ. P. 50 and the jury found for Boczar on Count II.

on Counts II and III. To this end, McAfee's counsel has identified the work that was performed in furtherance of the unsuccessful counts and has deducted those hours, on a line-by-line basis, from the work performed. Pl. Mem. at 7. And, the reduction for unsuccessful claims is reasonable, particularly considering that a common core of facts formed the basis for the three different claims.

Second, Boczar claims that the hours are not properly documented, Def. Br. in Opp. at 16, and that the case was "overstaffed" with an unreasonable amount of attorneys. Id. at 17. It is settled that the Court may also reduce an award of fees in the event of "overstaffing" as well as exclude hours that are "excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. The Supreme Court has emphasized that "'billing judgment' is an important component" in billing one's clients. Id. It is no less important where, as here, one is seeking to have the adversary pay the fees. "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." Id. (emphasis in original). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Id. at 433.

In an attempt to exercise the required billing judgment, McAfee has made a number of reductions to the hours sought. For

example, McAfee struck from her petition the hours spent by counsel's paralegal waiting for the jury to deliberate. Hurd Decl. ¶ 6(c). McAfee also notes that, while two attorneys attended all of the depositions in this case, she only seeks fees for one attorney when the deposed witness is classified as a "minor witness." Hurd Decl. ¶ 6(b).[9] McAfee also does not seek reimbursement for the expense of the firm librarian. Hurd Decl. ¶ 6(d).

Boczar's principal complaint is that McAfee's "Chart of Work Performed" reflects "daily block billing" and that, as a result, McAfee's supporting documentation is so inadequate as to require no fee award at all. Def. Br. in Opp. at 16. "Block billing" is generally defined as "grouping, or lumping, several tasks together under a single entry, without specifying the amount of time spent on each particular task." Guidry v. Clare, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006). To an extent, Boczar's

---

[9] Notably, however, in the "Chart of Work Performed," major and minor witnesses are grouped together with no way to determine which time was spent on which witnesses.  For example, page seven of the "Chart" indicates numerous entries pertaining to the preparation for and presence at the depositions of Wampler (classified as a major witness) and Emerson (who is classified as a minor witness).  Hours are listed for Mr. Hurd, Mr. Piepgrass, and Ms. Stone with the joint reference of "Wampler and Emerson."  Similarly, Yates (major) and Powers (minor) are jointly listed.  However, in the supplemental "Chart of Tasks and Hours" that was prepared at the Court's direction, counsel breaks down the amount of hours spent per deposition in a manner that identifies the amount of time spent per attorney preparing for and attending each deposition.  See Pl. Reply Ex. A.

observation appears to be correct.[10] Many of the entries for

Messrs. Hurd and Piepgrass show different tasks on the same day,

see Pl. Reply at 8, but almost all of the entries for those two

timekeepers involve multiple tasks "lumped" into a single

entry.[11] This type of time entry makes it difficult to ascertain

how much time was spent on each task. The practice of "block

billing" has been generally disfavored in federal courts across

the country and has often led to a reduction in attorney's

fees.[12]

_____

[10] In reviewing the "Chart of Work," it appears that the junior associates, Ms. Flynn and Mr. St. George, and the paralegals, Ms. Stone and Ms. Moore, did not engage in block billing; instead listing most, if not all, entries separately per task.

[11] To use an example cited by McAfee in her reply as evidence that block billing was not used, Pl. Reply at 8, while there are two entries for "WHH" on 03/26/12, the first entry is: "prepare for deposition of Sharon Wampler and Jane Emerson; take deposition of Sharon Wampler; confer with Eileen McAfee after deposition; place call to Mike Ward and obtain extension on response date to motion to amend answer" totaling 7.5 hours. The second entry is: "Review discovery issues with Stephen Piepgrass and Virginia Flynn; prepare for depositions on March 27; listen to phone calls recording" totaling .9 hours. This is representative of the "Chart of Work" entries for "WHH" and "SCP."

[12] See e.g., Welch v. Metropolitan Life Ins., 480 F.3d 942, 948 (9th Cir. 2007) ("It was reasonable for the district court to conclude that Welch failed to carry her burden, because block billing makes it more difficult to determine how much time was spent on particular activities."); Role Models American v. Brownlee, 353 F.3d 962, 971 (D.C. Cir. 2004) (expressing concern where "time records lump together multiple tasks, making it impossible to evaluate their reasonableness"); Robinson v. City of Edmond, 160 F.3d 1275, 1284 (10th Cir. 1998) (noting that block billing "does naturally and quite correctly raise

Because of this circumstance, the Court directed McAfee to address the discussion regarding the practice of block billing in Project Vote/Voting for America, Inc. v. Long, No. 2:10cv75, 2012 U.S. Dist. LEXIS 119009 (E.D. Va. Aug. 22, 2012). See ORDER OF SEPTEMBER 21, 2012 (Docket No. 125). In Project Vote, the court was presented with a fee petition in which the fee applicant had engaged in widespread block billing. There, the Court "did not find a single instance in which a timekeeper recorded multiple entries for a single day; instead, only the total amount of time for each day is reported, with no breakdown of how that time was spent among often as many as four or five distinct tasks." 2012 U.S. Dist. LEXIS 119009 at *28-*29. As a result of this insufficient documentation of hours, the Court imposed a fixed ten percent of reduction to the fee award. Id. at *29. In her reply, McAfee seeks to draw distinctions between Project Vote and this case. In this case, McAfee points out, the Chart of Work shows numerous instances of "multiple entries for the same day." Pl. Reply at 8. This is true, but as noted above, most of those entries still collate multiple tasks into a single block. The problem with block billing is that it "makes it more difficult to determine how much time was spent on particular

suspicions about whether all the work claimed was actually accomplished or whether it was necessary. This concern is particularly important in a situation where a party is seeking to have his opponent pay for his own lawyer's work.").

activities." Welch, 480 F.3d at 948. The distinction between Project Vote and this case is a difference of degree, not kind. The fact that there are fewer tasks lumped together only partially ameliorates the concern that arises from the lumping of tasks.

In her reply, McAfee asserts that, "as long as it is clear that the work being performed is related to reimbursable issues then it is irrelevant how much time was spent on separate discrete tasks." Pl. Reply at 7. This approach ignores the possibility that an attorney might devote reasonable time to one reasonably reimbursable request and spend an unreasonable amount of time on another reasonably reimbursable task, and that, as a result, a fee request must thereby be reduced. Such a result would be required by the command that the Court should not award fees for hours that "excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. Where a fee applicant has engaged in block billing, the adversary and the Court are disadvantaged in assessing the validity the hours expended, even after concluding that the tasks on which those hours were expended appear to be necessary tasks.

With her reply, and at the Court's direction, McAfee submitted a supplemental Chart of Work which identified the amount of work spent on many of the tasks specified in the block. Pl. Reply. Ex. C. In preparing the amended chart,

31

McAfee's counsel "made good faith estimates of the amount of time attributed to the various tasks contained within block-billed time entries . . . ." Pl. Reply at 8 n.5.

The Court has no doubt that, as an officer of the Court, Mr. Hurd made in good faith the estimates that are proffered to cure the block billing problem. However, in reality, it is nigh onto impossible to reconstruct old billing entries accurately. Estimates of the sort made here, while attempted in good faith, are actually little more than guesses when made for entries logged long in the past.[13]

Counsel prosecuting actions under § 1983 are charged with the knowledge that, if they prevail, fees are available from the adverse party under § 1988. Certainly, McAfee's counsel, who is very experienced in § 1983 cases and, in fact, has made fee requests under § 1988, knew that a fee application might well be made in this case. It is not demanding too much to ask that, in such cases, counsel refrain from block billing because, however

---

[13] The updated log was filed with the Court on October 5, 2012 as a result of the Court's Order of September 21, 2012 (Docket No. 125). The earliest entries on the "Chart of Work Performed" were for work that was performed in July 2011 and the most recent entries were for July 2012. Pl. Reply. Ex. C. Thus, not only did a year elapse between the first entry and the last, almost three months elapsed between the most recent entry and the attempt to identify the time spent on individual tasks.

acceptable it is to a client,[14] it is not helpful in assessing entitlement to a fee from an adversary under § 1988.

The traditional remedy for block billing is to apply a reasonable across the board fixed percentage reduction on amounts based on the trial court's familiarity with the case, its complexity and the counsel involved. Project Vote, 2012 U.S. Dist. LEXIS 119009 at *29; Guidry, 442 F.3d at 294.[15] Taking into account those factors and the information on the two charts submitted by McAfee, the appropriate remedy is to reduce the hours claimed by Messrs. Hurd and Piepgrass by ten percent (10%).[16]

In addition to the "block billing," Boczar complains that McAfee overstaffed the case. Def. Br. in Opp. at 17. It is settled, of course, that the district court may reduce the

---

[14] There is nothing inherently inappropriate with lumping or block billing. And, if clients accept the practice, lawyers properly may engage in it. But, more precision is required, when seeking to have the losing adversary pay the fees of a prevailing party.

[15] This approach was approved by the Supreme Court in Hensley wherein the Court noted that: "[i]n addition, the District Court properly considered the reasonableness of the hours expended and reduced the hours of one attorney by 30 percent to account for his inexperience and failure to keep contemporaneous time records." Hensley, 461 U.S. at 438 n.13. Since then, the exercise of this kind of informed discretion has been rather universally applied, but it depends upon the fact that the district court is sufficiently familiar with the case to make an informed judgment which, by its nature is subjective.

[16] By the Court's calculation, this would give Mr. Hurd a final total of 255.3 hours and Mr. Piepgrass a total of 328.5 hours.

number of hours sought if it determines that a case was overstaffed. See e.g. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1360 (4th Cir. 1995) (upholding the district court's decision to exclude hours spent by "an attorney in attending trial when that attorney examined no witnesses at trial and had 'no active participation' in the trial" as well as the hours spent by a paralegal engaged in "jury observation."); Goodwin v. Metts, 973 F.2d 378, 383 (4th Cir. 1992) (upholding a reduction in attorney's fees for "the use of three to four lawyers in the action when one or two would have sufficed"); Trimper v. City of Norfolk, 58 F.3d 68, 76-77 (4th Cir. 1995) ("Properly reducing allowable hours because of overstaffing of . . . falls soundly within the district court's proper discretion in determining an attorney's fee award.")

Boczar's expert, Mr. Gladstone, opined that "this case was overstaffed and, consequently, overworked by application." Gladstone Aff. at 8. According to Mr. Gladstone, the case could have been handled by a senior associate and a junior associate and paralegal. Id. at 7-8. Mr. Gladstone's opinions on this point read more like an amicus brief than an expert's opinion. His affidavit, thus, is not particularly helpful or persuasive on this point.

Moreover, it does not appear that the case was overstaffed. From a review of the "Chart of Work Performed," it appears that

the work done by the junior associates, Virginia Flynn and
Timothy St. George, was clearly appropriate to their experience
level and was well-documented. Their work was appropriately
limited and of the sort that should have been undertaken by more
junior lawyers. Likewise, the tasks performed by the paralegals
were properly allocated to them.

The core of Boczar's overstaffing objection is directed to
the amount of time spent by Messrs. Piepgrass and Hurd on the
same general tasks. For example, the "Chart of Tasks and Hours"
that the Court asked counsel for McAfee to prepare indicates
that Mr. Hurd and Mr. Piepgrass each spent over six hours on the
initial investigation and in preparing the complaint and,
similarly, Mr. Hurd spent 16.7 hours and Mr. Piepgrass spent
27.1 hours on the "Response to Motion for Summary Judgment." Pl.
Reply Ex. A. According to Boczar, these hours "overlap" and
"either Mr. Hurd or Mr. Piepgrass should be permitted [to bill]
. . . for these tasks, but not both of them." Def. Mem. in Opp.
at 18. Of course, "there is nothing inherently unreasonable
about a client having multiple attorneys." Norman v. Housing
Auth. of Montgomery, 836 F.2d 1292, 1302 (11th Cir. 1988). In
his Supplemental Declaration, Mr. Hurd explained the process by
which he and Mr. Piepgrass divided the work between themselves.
Hurd Supp. Decl. ¶ 6. According to the Declaration, on some
projects, Messrs. Hurd and Piepgrass would outline the brief

35

together; Mr. Piepgrass would prepare the first draft; Mr. Hurd would make edits; and Mr. Piepgrass would make the necessary changes and conduct any additional research and finalize the document. Id. On other tasks, Messrs. Hurd and Piepgrass would divide sections between themselves. Id. There is nothing unreasonable about this process; indeed, it actually is an efficient way to assure that the most experienced lawyer's time is spent efficiently, and it certainly helps avoid the concerns raised in Buffington.

Nor is it overstaffing for the two lawyers responsible for a case each to have made a factual investigation before preparing the complaint and in preparation for future work on the case. Indeed, a lawyer cannot properly discharge his ethical obligations to a client or the Court without knowing the facts involved in the case. And, the ability to divide work efficiently presupposes a basic knowledge of the facts of the case.

The petition reflects that Mr. Starr billed 4.3 hours, at $500 an hour, for work that consists of reviewing documents and talking with the client. Mr. Starr is the "client originator" and was consulted regarding the "longstanding friendship" between McAfee and Mr. Starr's wife. Hurd Decl. ¶ 9. The work that Mr. Starr performed is entirely duplicative of that which Messrs. Hurd and Piepgrass had to do. It is not reasonable to

36

have the adversary pay for that service. Therefore, the Court will not grant fees for the time requested by Mr. Starr.

In considering whether the time expended on the case was reasonable, it also is appropriate to consider that, at no time in the case, was Boczar willing to entertain settlement. The defense of this case was managed by the Division of Risk Management ("DRM") for Virginia, a state agency which is responsible to pay damages and settlements in cases such as this. As noted, in Saleh v. Moore, 95 F. Supp. 2d 555, 583 (E.D. Va. 2000), aff'd sub nom, Saleh v. Upadhyay, 11 Fed. App'x. 241 (4th Cir. 2001), "prosecution of an action against defendants, whose defense is funded by the Commonwealth, is a daunting task." Here, as in Saleh, the defense was conducted largely by not taking responsibility for Boczar's conduct and was "extensive and bitter and was conducted without apparent consideration of settlement . . . " Id. 583-84. That intransigence on the part of DRM continued even after the verdict where the Court once again required the parties to discuss settlement regarding the award of attorney's fees. See REPORT REGARDING SETTLEMENT CONFERENCE (Docket No. 124).

That kind of intransigence makes for expensive litigation. Here, as in Saleh:

> [T]he prosecution of the case was made more difficult, and for the Plaintiffs more costly, by the presentation of a highly

37

> aggressive and comprehensive defense. The
> Defendants, of course, were entitled to
> mount a full scale defense if they were so
> advised, but, where, as here, a defense of
> that ilk is unsuccessful, the Defendants
> must pay for the fees reasonably incurred by
> their adversaries in meeting the defense.

Saleh, 95 F. Supp. 2d at 574. The same circumstance occurred in this case.[17] Here, too, the defendant must bear the consequence of the "full-scale defense which no thought of settlement" strategy.

Third, Boczar says that the results obtained by McAfee in this case do not warrant any fee or, if a fee is awarded, the fee should be, at most, $15,000, five times the damage award. This argument is based on the long-standing principle that the degree of success achieved by the plaintiff is an "important factor," indeed "the most critical factor," in fixing a reasonable fee. Hensley, 461 U.S. at 434, 436.[18]

In Hensley, the Supreme Court posited the question to be addressed as follows:

---

[17] The fee application discusses this topic under the ambit of Johnson Factor 10 (undesirability of the case), but because this point is pertinent to the time component of the lodestar calculation, it is therein subsumed and should not be separately considered. Whether undesirability of a case always will be subsumed in the lodestar time component need not be decided today.

[18] That is reflected in Johnson Factor 8 (the amount in controversy and the results obtained). And, that is how the parties discuss the question here. The question, however, is more properly considered as an aspect of the time component of the lodestar calculation.

> [D]id the plaintiff achieve a level of
> success that makes the hours reasonably
> expended a satisfactory basis for making a
> fee award.

461 U.S. at 434. For example, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." Id. at 435. The Court went on to explain that: "[i]f, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Id. at 436. The foregoing explanations, of course, were made in context of assessing the consequences that ensue when a civil rights plaintiff has asserted a number of claims, but has prevailed on fewer than all claims. Nonetheless, those explanations teach that the degree of success analysis is part of the time component of the lodestar calculation.

Here, McAfee prevailed on one out of three claims, each of which presented a different theory of recovery based on the same set of facts. The Supreme Court addressed this circumstance in Hensley, saying that:

> In other cases the plaintiff's claims for
> relief will involve a common core of facts
> or will be based on related legal theories.
> Much of counsel's time will be devoted
> generally to the litigation as a whole,
> making it difficult to divide the hours
> expended on a claim-by-claim basis. Such a
> lawsuit cannot be viewed as a series of

> discrete claims. Instead the district court
> should focus on the significance of the
> overall relief obtained by the plaintiff in
> relation to the hours reasonably expended on
> the litigation.

Hensley, 461 U.S. at 435. That is the situation presented here

and so the task is to focus on the significance of the overall

relief obtained in relation to the hours reasonably expended.[19]

Boczar's contention is that McAfee achieved limited

success. Therefore, says Boczar, the fee must be reduced – or no

fee should be awarded – because the jury's verdict was for

$2,943.60, which Boczar calls a "nominal" damage award.

To begin, the damage award was not "nominal." That term

refers to "damages awarded for the infraction of a legal right,

where the extent of the loss is not shown, or where the right is

one not dependent upon loss or damage. . . . The award of

nominal damages is made as a judicial declaration that the

plaintiff's right has been violated." Charles T. McCormick,

Handbook on the Law of Damages, § 20, at 85 (1935). Here, the

jury made an award of actual damages representing the entirety

of McAfee's out-of-pocket expenses. Thus, the award, albeit

---

[19] Boczar discusses this as Johnson Factor 8 (the amount in
controversy and the results obtained). And, indeed, that factor
is quite analogous to the "limited success" concept. But,
Henlsey makes clear that the extent of success is to be
considered in context of the reasonableness of the time expended
to secure the result that was obtained.

small in dollars, was significant in respect of the total amount of out-of-pocket expense (i.e., 100 percent).

The jury, however, awarded no sum for McAfee's recited emotional distress. Nor did the jury award punitive damages. Those facts, says Boczar, show very limited success.

Boczar's argument runs into the Supreme Court's plurality decision in Rivera v. City of Riverside, 477 U.S. 561 (1986). There, the Court acknowledged that "[t]he amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded under § 1988." 477 U.S. at 574. However, the Court went on explicitly to reject the notion that amount of fees awarded must be proportionate to the damages actually recovered. Id. The reason for this is that a "civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." Id. Unlike a typical tort plaintiff,

> The damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future. This deterrent effect is particularly evident in the area of individual police misconduct, where injunctive relief generally is unavailable. Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance.

41

Id. at 575 (internal quotations and citations omitted). Accordingly, the Court noted that the main purpose of § 1988 was to "enable plaintiffs to enforce the civil rights laws even where the amount of damages at stake would not otherwise make it feasible for them to do so." Id. at 577.

Boczar attempts to distinguish Rivera from this case. Relying heavily on a First Circuit decision, Lewis v. Kendrick, 944 F.2d 949 (1st Cir. 1991), Boczar argues that in some cases the amount of recovery might be so low as to bar award of fees in their entirety. In essence, Boczar claims that McAfee is not truly a prevailing party within the scope of the statute. In Rivera, the Court observed that "[r]egardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards." Rivera, 477 U.S. at 574. Here, McAfee's claim was based on a vindication of her Fourth Amendment rights. There are considerable social benefits and potential for deterrence of future civil rights violations. See Rivera, 477 U.S. at 575 (internal citations omitted) ("In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. This deterrent effect is particularly evident in the area of individual police misconduct, where injunctive relief generally is unavailable.") (internal citations omitted).

Accordingly, McAfee is properly considered a prevailing party who enjoyed a significant degree of success in her action.

Notwithstanding the quantum of damages in this case, McAfee's judgment made it quite clear to Boczar, and to law enforcement officers throughout Virginia, that the power to effect an arrest must be exercised within the confines of the Fourth Amendment. Boczar clearly needed that lesson for she exercised her arrest authority without a basis in fact or law. To secure the arrest warrant, Boczar knowingly made a materially untrue representation to the magistrate.[20] McAfee's judgment here, albeit small in amount, will protect other citizens from the wrongful exercise of the arrest power by Boczar, as well as other law enforcement officers. Thus, McAfee's vindication of her Fourth Amendment rights serves a purpose that inures to the benefit of the citizens of Virginia.

The judgment also serves the community by reinforcing in the minds of law enforcement officers that they will personally bear the consequences of making untrue statements to secure arrest warrants. The benefits of that lesson cannot be measured in dollars alone because it will help to assure that other citizens will not be treated as McAfee was treated as a consequence of Boczar's conduct.

---

[20] Memorandum Opinion of August 15, 2012 (Docket No. 121) at 6-7.

The judgment also teaches that the legal system does not sanction the making of untrue statements to magistrates to secure an arrest warrant. Those who might be so tempted can see that the untruth will be uncovered and the result will be the imposition of a money judgment and substantial attorney's fees.

Finally, but importantly, the verdict here cleared McAfee's name and reputation. It put to rest any notion that she had committed a crime.

In sum, McAfee's judgment, even though small in monetary terms, cleared her name and serves to protect Virginia's citizens from unlawful conduct at the hands of law enforcement officers. Boczar acted capriciously and without cause to deprive McAfee of her liberty. The statute under which McAfee brought this claim to federal court was intended in part to secure the redress of capricious conduct by law enforcement officers. Here that purpose has been served.

Taking into account all of these results, it cannot be said that a reduction in the number of hours is warranted because McAfee prevailed only on one out of three closely related claims or because the quantum of damages was small. Instead, the hours expended were reasonable and necessary to vindicate, for McAfee and other citizens of Virginia, a most important right secured by the Fourth Amendment of the United States Constitution.

44

It is unfortunate that, after the case was dismissed at the end of the prosecution's case in state court, that Boczar did not offer a public apology and that DRM did not pay McAfee's out-of-pocket expenses, a course which likely would have ended the matter. Instead, Boczar and DRM forced McAfee to bring this case to vindicate her rights. Considering what was at stake, the nature of the right at issue, and the needlessly litigious approach taken by Boczar and DRM, the Court concludes that the degree of success factor cannot be used to reduce the time component of McAfee's fee request.

## C.   The Lodestar Fee

The product of applying a reasonable hourly rate to the number of hours reasonably expended (as reduced by McAfee and the Court) yields a lodestar fee figure of $322,340.50. Under Perdue, there is a strong presumption that the lodestar calculation produces a reasonable and sufficient fee. 130 S. Ct. at 1673. And, here it does just that, notwithstanding that the fee is disproportionate to the actual damage award.[21]

## D.   Costs

McAfee asks for $10,305.51 in costs. The expenses include a wide variety of items such as the filing fee, transcript costs,

---

[21] The reasonableness of the fee as a whole can also be assessed in perspective of other fee awards. The awards offered by McAfee tend to support the lodestar figure, but they are not of much help because they are somewhat, but not closely, similar to this case. Boczar made no showing on this point.

research costs, witness fees, and parking. Litigation expenses are recoverable under the statute. 42 U.S.C. § 1973gg-9(c). Boczar has noted no objection to the requested costs. The Court finds that the requested costs are reasonable and awards McAfee the full amount.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part McAfee's PETITION FOR ATTORNEY'S FEES AND COSTS. As discussed above, the Court has determined that the rates requested by McAfee are reasonable and that, with the exception of the hours billed by Mr. Starr, the hours expended (after a ten percent (10%) reduction for block billing as to time billed by Messrs. Hurd and Piepgrass) are reasonable. The Court awards McAfee fees in the amount of $322,340.50 and costs in the amount of $10,305.51. McAfee is granted leave to file a "fee-on-fee" petition.

It is so ORDERED.

_____ /s/   REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 2, 2012

46